IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JENNIFER DAVENPORT, | ) | CASE NO. 1:16-CV-2603 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Jennifer Davenport ("Davenport") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying her application for

Supplemental Security Income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42

U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of

the parties. Doc. 18.

For the reasons stated below, the decision of the Commissioner is **AFFIRMED**.

## I. Procedural History

Davenport filed an application for SSI in June 2014, alleging a disability onset date of

February 1, 2011. Tr. 12, 152. She alleged disability based on the following: right hand

problems, right leg injury, right knee replacement and arthritis. Tr. 179. After denials by the

state agency initially (Tr. 85) and on reconsideration (Tr. 97), Davenport requested an

administrative hearing. Tr. 115. A hearing was held before Administrative Law Judge ("ALJ")

Penny Loucas on May 25, 2016. Tr. 33-53. In her June 14, 2016, decision (Tr. 12-28), the ALJ

determined that a prior disability application was denied on April 12, 2013; that there was no

new and material evidence regarding Davenport's condition; and that there are jobs that exist in

significant numbers in the national economy that Davenport can perform, i.e. she is not disabled. Tr. 12, 26.  Davenport requested review of the ALJ's decision by the Appeals Council (Tr. 7) and, on September 3, 2016, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Davenport was born in 1967 and was 46 years old on the date her current application was filed.  Tr. 152.  She completed high school and attended some college.  Tr. 39.  A prior disability application was denied on April 12, 2013.  Tr. 12, 58-69.

### B. Relevant Medical Evidence

**Physical:** On August 25, 2013, Davenport visited the emergency room at St. Vincent Charity Medical Center complaining of lower right arm pain after she became intoxicated, got into an altercation with her boyfriend, and was thrown down the steps.  Tr. 327.  An x-ray of her right arm showed a distal humeral diaphysis fracture.  Tr. 326.  She was placed in a splint and discharged.  Tr. 329.

On August 30, 2013, Davenport visited the emergency room at MetroHealth complaining of right arm pain and right thigh pain.  Tr. 257.  She complained that the splint that had been applied to her arm was too tight.  Tr. 257.  She reported being able to get up and ambulate.  Tr. 257.  She had no back pain, no numbness, and exhibited no confusion.  Tr. 257.  Upon exam, she had tenderness on her thigh along a well-healed incision.  Tr. 258.  An x-ray of her arm showed comminuted distal humeral shaft fracture.  Tr. 258.  An x-ray of her thigh showed a prior plate and surgical screw, intact hardware, and post-traumatic arthritis in her knee, the results of which

were stable in appearance when compared to a prior study. Tr. 259. Davenport was re-splinted, discharged, and advised to follow up with orthopedics. Tr. 260.

On November 11, 2013, Davenport visited the orthopedics department at MetroHealth for a follow-up. Tr. 255. Upon exam, she had decreased radial nerve function and decreased range of motion in her wrist (3/5) and fingers (2/5). Tr. 255. The doctor instructed Davenport on range of motion exercises for her wrist and hand to keep them supple while in her splint and remarked that she had "some radial nerve function which is encouraging for return of function over the next few months, can consider electrodiagnostics if this does not continue." Tr. 255.

On February 10, 2014, Davenport returned to the orthopedics department. Tr. 249. She reported utilizing her clamshell brace and wrist splint, complained of a numb area along the inner aspect of her hand and thumb, and stated that she experienced pain at the time of the visit but that she had not been taking anything for the pain. Tr. 249. Upon exam, her wrist extension was 4/5 and her wrist, hand and finger extension were 5/5. Tr. 250. Sensation was grossly intact except for numbness in the first web space of her hand. Tr. 250. An x-ray of her right humerus showed callus formation and maturation of a previously noted callus. Tr. 250. Davenport was advised that she no longer needed to wear her clamshell brace, could wean off her wrist brace, could gradually increase weightbearing status, and was referred to occupational therapy to improve strengthening and desensitization. Tr. 250.

On February 12, 2014, Davenport saw Jessica Griggs, D.O, complaining of numbness and tingling in her feet and bilateral knee pain. Tr. 246-247. She was taking naproxen, which did not help, and she had lost her cane, which helped her walk. Tr. 246. Upon exam of her knees, she had crepitus and tenderness with passive flexion, extension and rotation. Tr. 247. Dr. Griggs prescribed tramadol and applied for an arthritis service request. Tr. 247.

On May 19, 2014, Davenport returned to the orthopedics department and saw Jennifer Peterson, M.D.  Tr. 240.  She complained of chronic right knee pain that had worsened over the past three days.  Tr. 240.  She had also begun using a cane three days prior.  Tr. 240.  She denied numbness or tingling.  Tr. 240.  Her history included a patella fracture 24 years prior.  Tr. 240.  She had some pain in her right wrist but it had improved since her last visit.  Tr. 240.  Upon exam, she had moderate swelling of her right knee with tenderness upon palpation, crepitus and grind.  Tr. 241.  An x-ray of her right arm showed satisfactory callus formation and an x-ray of her right knee/femur showed surgical plate and screws in her femur with old callus formation and tricompartmental arthritis, worse in the patellofemoral compartment.  Tr. 241.  Dr. Paterson assessed a well-healed arm fracture with significantly improved strength and nerve recovery.  Tr. 241.  She was more concerned with Davenport's right knee pain due to post-traumatic arthritis from her prior knee fracture.  Tr. 241.  Dr. Paterson recommended surgery to remove the surgical hardware and a total knee replacement.  Tr. 241.

On August 21, 2014, Davenport had a pre-surgical evaluation.  Tr. 374.  She complained of pain in her joints and multiple parts of her body.  Tr. 375.  She detailed her injury list: a fractured right femur and patella 24 years prior, a hairline fracture in her left hip, and a mandibular fracture.  Tr. 375.  She reported daily pains in these areas that were not relieved by occasional over-the-counter Aleve.  Tr. 375.  Upon exam, she had a normal gait, decreased range of motion in her right shoulder due to right arm pain, distorted right distal humerus, mild osteoarthritic changes in her hands, and bilateral pedal edema in her ankles.  Tr. 378.  She had no synovitis and her pain was assessed as most likely being due to her prior injuries.  Tr. 377.

On September 3, 2014, Davenport had surgery to remove the hardware in her right femur.  Tr. 352.

On November 14, 2014, Davenport visited the orthopedics department and saw Brendan Patterson, M.D., for a follow-up visit. Tr. 509. She stated that the pain in her right knee was tolerable but she was experiencing a burning pain in her left knee. Tr. 509. Upon exam, she walked with an antalgic gait favoring the right knee. Tr. 509. Her right knee range of motion was 0-125 degrees with no instability and a well-healed incision. Tr. 509. Bilateral knee x-rays were taken; her left knee showed excellent alignment and mild joint space narrowing. Tr. 509. Her right knee had post-surgical changes with post-traumatic arthropathy, especially in her patellofemoral joint. Tr. 509. Dr. Patterson advised that Davenport may need a total right knee arthroplasty, which would be deferred until her symptoms were no longer managed by modification of activity and medication. Tr. 509.

On December 2, 2014, Davenport began physical therapy. Tr. 503. At her initial visit, she had an independent, slow and antalgic gait (she did not bring her cane with her that day), decreased range of motion in her right knee, bilateral decreased strength and flexibility in her lower extremities, and decreased weight bearing on her right. Tr. 505-506. She reported difficulty getting in and out of a car and using stairs. Tr. 505. On her second visit on December 8, she had an antalgic gait without assistive device (she had left her cane in the car). Tr. 502. She had been doing the recommended exercises to tolerance. Tr. 502. Her knees hurt and her back had been cramping the last few days. Tr. 502. Her muscles were shaking when performing exercises due to muscle weakness and the physical therapist recommended applying cold packs at home after performing exercises. Tr. 503.

On April 23, 2015, Davenport saw pain management doctor Antwon Morton, D.O., upon referral from Dr. Griggs. Tr. 900. Davenport reported diffuse body pains and having difficulty with her ADLs. Tr. 900. The medication she had received from her primary care physician did

not help.  Tr. 900.  She reported trying to stay active but the pain was severe at times and she had

to rest; physical therapy made her pain worse.  Tr. 900-901.  She had tried to work as a server in

a restaurant but could not due to pain.  Tr. 900.  Upon exam, Davenport had tenderness and

mildly decreased range of motion in her lumbar spine and a slow and antalgic gait.  Tr. 904.  She

used a single point cane to ambulate.  Tr. 904.  Motor strength was normal in all lower and upper

extremities, her range of motion in all lower and upper extremities was within normal limits, and

she had normal sensation and normal fine motor coordination.  Tr. 904.  Dr. Morton assessed

chronic diffuse myofascial pain, arthralgias and gait disturbance and prescribed medication.  Tr.

904.

On May 15, 2015, Davenport saw Dr. Patterson complaining of bilateral knee pain, left

worse than right.  Tr. 910.  Examination of her left knee showed trace effusion and tenderness.

Tr. 910.  Dr. Patterson observed that Davenport's prior knee x-rays showed less degeneration on

the left side than the right, despite the left knee being the more symptomatic side, and ordered an

MRI of her left knee.  Tr. 910.  Davenport obtained an MRI of her left knee on July 30, 2015; it

showed a degenerative tear in the posterior horn of her medial meniscus, degenerative changes,

and suprapatellar joint effusion.  Tr. 940.

On September 22, 2015, Davenport returned to the orthopedics department and saw John

Wilbur, M.D., complaining of left knee pain.  Tr. 937.  Upon exam, her left knee had mild

effusion and tenderness and a full range of motion.  Tr. 937.  Dr. Wilbur recommended that she

have arthroscopic surgery.  Tr. 937.  On October 22, 2015, Dr. Wilbur performed a left knee

arthroscopy and partial medial meniscectomy.  Tr. 931.

On February 12, 2016, Davenport returned to Dr. Wilbur for a follow-up visit.  Tr. 994.

She reported that her surgery "definitely helped" her left knee, although she was still having

some aching pain and requested bilateral knee injections. Tr. 995. Upon exam of both knees, she had well-healed incisions, good range of motion, minimal effusion, and diffuse tenderness. Tr. 995. Dr. Wilbur injected both knees. Tr. 995.

On March 29, 2016, Davenport saw Dr. Morton requesting only that he fill out disability forms. Tr. 985. She complained of diffuse body pains and difficulties with daily activities. Tr. 986.

**Mental:** On December 12, 2014, Davenport visited Dr. Griggs for sleep medication and complained of feeling more depressed. Tr. 878.

Davenport began mental health counseling at Connections on August 10, 2015. Tr. 944. She reported not receiving any mental health treatment since the 1990s. Tr. 947. She lived with her boyfriend and two other people; many of her current symptoms (being depressed, agitated, volatile) stemmed from her living situation. Tr. 944. She was last on medication two months prior. Tr. 944. Evaluating therapist Amanda Alpine observed agitation, flat affect, mumbled voice, and poor eye contact. Tr. 951. Alpine diagnosed bipolar disorder, currently depressed, and alcohol abuse and assessed a GAF score of 45.[1] Tr. 952-953.

On September 11, 2015, Davenport had a psychiatric evaluation with Louis Klein, M.D., at Connections. Tr. 955-959. She reported mood swings and anger and that ongoing anger caused her to lose her job. Tr. 955. Upon exam, Davenport had a constricted affect, normal eye contact, normal demeanor, logical thought process, normal thought content, euthymic mood, cooperative behavior, normal cognition, average intellect, fair insight, and fair judgment. Tr.

---

[1] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." *Id.*

956-957.  She was mildly distant at first, but rapport improved quickly and by the end of the session she was able to smile and laugh at intervals.  Tr. 957.  Dr. Klein diagnosed bipolar disorder, mixed, moderate, and assigned a GAF score of 54.[2]  Tr. 959.  He started her on Trazadone, Lithium, and Citalopram and discussed the importance of treatment compliance.  Tr. 957-958.

Davenport saw Dr. Klein again on October 9, 2015.  Tr. 965.  Davenport "implied her anger episodes are less frequent with Lithium," although she was "reluctant to specifically acknowledge improvement."  Tr. 964.  Her sleep was poor despite taking Trazodone.  Tr. 964.  Her mental status examination findings were unchanged since her last visit.  Tr. 965.  Dr. Klein increased her Trazodone dosage.  Tr. 964.  In her counseling session with case manager Stephanie Henderson immediately following, Davenport was pleasant and able to focus on the conversation.  Tr. 962.

On November 3, 2015, Henderson observed that Davenport was pleasant and able to focus on the conversation.  Tr. 968.  Davenport reported doing ok despite physical issues and "family drama."  Tr. 968.  On December 1, Henderson observed that Davenport had a depressed mood and flat affect, although she was focused and reported doing ok.  Tr. 969-970.  Davenport requested assistance finding housing.  Tr. 970.

On January 8, 2016, Henderson found Davenport to be depressed, pleasant and appropriate.  Tr. 974.  Davenport stated that she was feeling the effects of not having her medication.  Tr. 974.  Staff assisted her with her applications for housing, obtaining medication, and in obtaining food; Davenport had also complained of severe and persistent hunger because she did not have food.  Tr. 974.  On February 19, she was still out of medications.  Tr. 1008.  She

---

[2] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *See* DSM-IV-TR, at 34

had missed a doctor appointment and was "just getting by." Tr. 1008. She reported "couch surfing" and resisted advice to go to a shelter because she stated that shelters were not good for her mental health. Tr. 1008. She reported having multiple "alter egos" that speak to her daily but that she had never mentioned this problem to anyone before. Tr. 1008. Her attitude got in the way of her employment. Tr. 1008. An effective coping skill was being around people and talking to them. Tr. 1008. Upon exam, Henderson observed that she was guarded, frustrated, but pleasant. Tr. 1008. She advised Davenport to discuss her alter egos with her psychiatrist. Tr. 1008.

On February 26, 2016, Davenport saw Henderson and reported not doing ok; she had "a lot" of anger and hallucinations. Tr. 1010. She saw black bugs crawling on her when she was angry. Tr. 1010. She had increased the dosage of her medication to increase its effectiveness. Tr. 1010. Henderson urged Davenport to keep her doctor appointments in order to maintain medication compliance. Tr. 1010. Immediately following that appointment, Davenport had an appointment with Dr. Klein, her third visit with him. Tr. 1011-1013. She reported that the medications "did not work." Tr. 1011. Dr. Klein reminded her that he had not seen her in over four months and that she had not shown up for two appointments. Tr. 1011. She stated that her anger is part of her multiple personality disorder. Tr. 1011. Dr. Klein stated that her mental status examination findings were unchanged since the previous visits, except that she bit her nails for most of the session. Tr. 1011. She was irritated but showed no anger or lability. Tr. 1011. Dr. Klein increased her medication dosages and discussed the importance of treatment compliance. Tr. 1011-1012.

Davenport returned to Dr. Klein on April 1, 2016. Tr. 1014. She said that she was "pleased to report" that the increased lithium helped her anger. Tr. 1014. She was sleeping

better and did not mention anything about her different personalities. Tr. 1014. She was frustrated with her current case manager but she "described adequate ability to work with community agencies...to find housing so she might not even need [a case manager]." Tr. 1014. Currently, she was staying with family and friends. Tr. 1014. Dr. Klein continued her medications and discussed the importance of treatment compliance. Tr. 1015.

### C. Medical Opinion Evidence

#### 1. Treating Physicians

**Physical:** On March 29, 2016, Dr. Morton completed a physical medical source statement. Tr. 978-980. Dr. Morton advised that he had seen Davenport twice: in April 2015 and in March 2016. Tr. 978. He listed her diagnoses of chronic diffuse myofascial pain/arthralgias, gait disturbance and knee osteoarthritis. Tr. 978. He stated that he was not currently prescribing any medication for her. Tr. 978. He opined that Davenport could occasionally lift and carry up to 10 pounds and frequently handle, grasp and finger. Tr. 978. She could stand for 30 minutes at a time for a total of 3 hours in an 8 hour work day, walk for 30 minutes at a time for a total of 2 hours in an 8 hour work day, and sit for 60 minutes at a time for a total of 4 hours in an 8 hour work day. Tr. 979. She would need anywhere from 5 to 10 unscheduled breaks lasting 5 to 10 minutes each. Tr. 979. He could not say how long she would have to rest before returning to work ("to be determined (when her pain is better managed)"). Tr. 979. She would be off task more than 25% of the work day. Tr. 979. Due to pain flares in her knees, back and feet, Davenport would be absent from work 5-10 days per month. Tr. 980. Her condition was chronic and had manifested more than five years prior. Tr. 980.

**Mental:** On February 26, 2016, Dr. Klein filled out a mental residual functional capacity questionnaire on behalf of Davenport. Tr. 975-977. Dr. Klein advised that he had seen her twice

in 2015, in September and October; she missed two sessions thereafter; and he saw her a third time on the day that he filled out the questionnaire.  Tr. 975.  He stated that Davenport's medication dosages were still being adjusted.  Tr. 975.  He opined that she would be off task more than 25% of a workday and that she had a poor ability to sustain a regular work schedule.  Tr. 975.  He assessed a few moderate and marked limitations and mostly extreme limitations.  Tr. 975-976.  When asked when Davenport's limitations began, Dr. Klein answered, "pt states around age 13-14."  Tr. 977.  When asked for additional comments to support his opinions, Dr. Klein advised that his assessments were based on "no one other than Ms. Davenport's own descriptions which seem credible."  Tr. 977.

### 2. Consultative Examiners

**Physical:** On October 23, 2014, Davenport saw Hasan Assaf, M.D., for a consultative examination.  Tr. 490-498.  Dr. Assaf observed that Davenport had an antalgic gait and used a cane, and stated that, in his opinion, the cane was medically necessary.  Tr. 492.  Manual muscle testing of her shoulders, elbows, wrists, fingers, hips, knees, ankles, feet and toes were normal.  Tr. 495.  Her grasp, manipulation, pinch and fine coordination were normal.  Tr. 495.  She had no muscle spasm or atrophy.  Tr. 496.  Range of motion in her upper extremities were normal, her lumbar spine showed a slight decrease in flexion (80/90) and extension (20/30), her hips showed a slight decrease in flexion bilaterally (80-90/100), and she had a decreased range of motion in her knees, right greater than left.  Tr. 496-498.  Dr. Assaf opined that Davenport had marked limitations in her ability to stand, walk, squat and weight bear.  Tr. 494.

**Mental:** In conjunction with her prior application for disability benefits, Davenport underwent a psychological consultative examination with Donald House, Ph.D., in December 2011.  Tr. 230-237.  Davenport reported that she was psychiatrically hospitalized in 2004

following a suicide attempt, but that she had no other psychological services since that time. Tr. 232. She had been on medication (Zoloft and Trazodone) and she last took them five years prior. Tr. 232. After assessment, Dr. House opined that Davenport had depressive disorder, NOS; post-traumatic stress disorder; obsessive compulsive disorder; and cannabis abuse. Tr. 235. She had long-term memory difficulties and inconsistencies, somewhat intact concentration and attention, fair short-term memory, and generally intact intellectual resources. Tr. 236. She is socially isolated and would likely have some difficulties interacting with others on a consistent basis due to mood swings and depersonalization. Tr. 236. Dr. House assigned Davenport a GAF score of 41 and opined that she "would appear to be disruptive and dysfunctional in a work environment as stress levels increase." Tr. 236. He remarked that she demonstrates serious impairment in employability from an emotional standpoint and that she receives little or no treatment. Tr. 237.

On August 19, 2014, Davenport underwent another consultative examination with Dr. House in conjunction with her current application. Tr. 335-343. She denied any treatment since the 2011 consultative exam, although she advised that she was prescribed Trazadone through a provider at MetroHealth Hospital. Tr. 337. She reported that she was an ongoing cannabis user and smoked prior to coming to the examination. Tr. 337. Dr. House observed that Davenport was irritable and somewhat hostile and that she seemed "emotionally isolated." Tr. 338. Considering her substance abuse, Dr. House saw her as impulsive. Tr. 338. He wrote, "It does not appear that she is bipolar as in the previous report." Tr. 339. Her persistence was somewhat poor and she had difficulties completing the tasks Dr. House asked her to perform. Tr. 340. He stated that, regarding her reduced concentration levels since the prior examination, she had been "somewhat uncooperative" and it was not clear whether her lack of cooperation was a result of

cannabis intoxication. Tr. 342. He assessed her with low coping skills and emotional resources and opined that she would be highly to significantly disruptive and dysfunctional in a work environment. Tr. 342. He stated that she appeared to resort to substance abuse to assist in her emotional treatment. Tr. 342. Dr. House diagnosed mood disorder, anxiety disorder, obsessive compulsive disorder, cannabis use disorder and personality disorder and again assigned a GAF of 41 based on "serious levels of depersonalization." Tr. 342-343. Dr. House opined, "Her prognosis is poor. She would not really commit to treatment." Tr. 343.

### 3. State Agency Reviewers

**Physical:** On October 29, 2014, state agency physician Abraham Mikalov, M.D., reviewed Davenport's file. Tr. 81-82. Regarding Davenport's RFC, Dr. Mikalow remarked that she had limitations from her conditions but "they have not drastically changed since the prior ALJ, which is adopted." Tr. 81. On December 18, 2014, state agency physician Diane Manos, M.D., reviewed Davenport's file and concurred with Dr. Mikalov's opinion. Tr. 93-94.

**Mental:** On September 29, 2014, state agency physician Joseph Edwards, Ph.D., reviewed Davenport's file and adopted the prior ALJ's findings. Tr. 80. On January 1, 2015, state agency physician Irma Johnston, Psy.D., reviewed Davenport's file and concurred with Dr. Edward's opinion. Tr. 92-93.

### D. Testimonial Evidence

### 1. Davenport's Testimony

Davenport was represented by counsel and testified at the administrative hearing. Tr. 38-48. She was currently living with her stepdaughter; otherwise, she is homeless. Tr. 39. Since April 2013, when her prior application was denied, her condition has gotten worse. Tr. 39. She wants a knee replacement but her doctor won't give her one and instead is giving her shots. Tr.

40.  Nothing is helping.  Tr. 40.  Both knees are worse than they were before and her left knee is worse than her right knee "because I've been carrying the right one."  Tr. 40.  The left knee burns, gives out, and aches.  Tr. 40.  Going up and down steps makes the pain worse.  Tr. 40.  Currently, she was living in the basement and she had to go up the stairs to use the bathroom.  Tr. 40.

Davenport testified that she had surgery on her left knee to fix a tear and "scrape [] my bone."  Tr. 41.  The surgery did not help.  Tr. 41.  She still has arthritis in her right knee.  Tr. 41.  Her right knee symptoms are the same as the left knee; aching, burning, and sometimes she can't get up and walk on it.  Tr. 41.  She does not want to leave her daughter's house despite "going up and down these steps all the time" because she is not comfortable sitting on somebody else's couch.  Tr. 41.  She had surgery on her right knee, too, to remove the surgical hardware that had been in place from a prior surgery, but they could not get all the hardware out because it was imbedded in her femur bone.  Tr. 41.  They are going to wait ten years for a knee replacement but she cannot wait ten years.  Tr. 42.

Davenport uses a cane daily for balance.  Tr. 42.  It was prescribed for her about two years ago.  Tr. 42.  She also has pain in her lower back.  Tr. 42.  It's worse when she stands for long periods of time, such as over an hour.  Tr. 42.  If she stands for more than an hour she has to sit down for about 10 minutes before getting up again.  Tr. 43.  She sometimes has problems in her lower back and knees while sitting.  Tr. 43.  She estimated she could sit for 30-45 minutes before having to get up.  Tr. 43.

For pain and spasms, she currently takes Tizanidine, which helps sometimes.[3]  Tr. 43.  She was on Percocet but she stopped taking it.  Tr. 43.  They also gave her Oxycodone.  Tr. 43.

---

[3]  Tizanidine is used as a short-acting agent to manage the increased muscle tone associated with spasticity.  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1932.

Sometimes, before she takes her medication, her pain is excruciating.  Tr. 43.  After she takes her medication, her pain is calmed a little bit and she doesn't hurt as bad as before.  Tr. 44.  This lasts for about half an hour.  Tr. 44.  The medication bottle instructs that she can take it every four hours.  Tr. 44.  When she has excruciating pain, she has to stop what she is doing.  Tr. 44.  She sits down and props up her legs.  Tr. 44-45.  She is in excruciating pain about 65% of the day.  Tr. 44.  Sometimes she cries because it hurts so bad.  Tr. 45.  She also has pain in her right arm, in her humerus bone.  Tr. 45.  Because of it, she can't lift anything other than "maybe some eggs or something."  Tr. 45.  When asked if she is right handed or left handed, she replied, "I use my right hand for everything."  Tr. 45.[4]  She estimated that she can lift no more than 10 pounds; "I'm not lifting nothing else any heavier."  Tr. 47.

Currently, Davenport is seeing Dr. Klein for her anger issues.  Tr. 45.  It is hard for her to get along with other people.  Tr. 45.  She has hit her boyfriend.  Tr. 45.  She had problems getting along with co-workers and supervisors when she was working; "I always got into it with somebody."  Tr. 46.  She gets into physical altercations "a lot" and the last time was two weeks ago.  Tr. 46.  She also sees Dr. Klein for her bipolar.  Tr. 46.  When asked to explain what bipolar means to her, she responded, "I'm always flipping."  Tr. 46.  For instance, if she is being bothered, she goes "from anger from like zero to 100 in, like, two seconds."  Tr. 47.  She does not like being bothered.  Tr. 47.  She takes lithium for her bipolar.  Tr. 47.  It causes her to be sleepy.  Tr. 47.

Davenport also sometimes smokes marijuana because it eases her pain a little better than the medicine that they give her.  Tr. 47.  She is more relaxed.  Tr. 47.  She uses it depending on

---

[4] Indications in the record show that Davenport is left-handed.  Tr. 224, 492.

where she is in her pain and estimated that she used it once a week.  Tr. 47.  It's not something she needs all the time, it just helps.  Tr. 47.  She rarely drinks alcohol.  Tr. 47.

### 2. Vocational Expert's Testimony

Vocational Expert ("VE") Mark Anderson testified at the hearing.  Tr. 48-52.  The ALJ asked the VE to determine whether a hypothetical individual with Davenport's age, education and work experience could perform work if the individual had the following characteristics: can perform sedentary work, will use a cane when standing and walking, can occasionally climb ramps and stairs, bend, balance and stoop but never kneel or crawl, can reach in all directions, can frequently handle, finger and feel, can have no exposure to extreme temperatures, humidity, vibration or hazards, can perform simple, routine tasks with simple, short instructions, make simple decisions, have few changes, and have superficial interaction with co-workers, supervisors, and the public.  Tr. 48.  The VE answered that such an individual could perform work as a bonder (2,500 regional jobs; 10,000 Ohio jobs; 100,000 national jobs), touchup screener (1,700 regional jobs; 5,200 Ohio jobs; 158,000 national jobs), and inspector of wooden products (2,500 regional jobs; 11,000 Ohio jobs; 120,000 national jobs).  Tr. 49.  The ALJ asked if the VE's answer would change if the hypothetical individual would be off-task 10% or 20% of the time.  Tr. 49-50.  The VE replied that 10% off-task time is an acceptable level but that 20% off-task time is not, and that there would be no competitive work available for such an individual.  Tr. 50.

Next, Davenport's attorney asked the VE whether the jobs he identified required the worker to get up and get parts or anything else during the day, and the VE answered that they do not.  Tr. 50.  He explained that the workers could sit for the entire time or stand, if they wished to, when performing the jobs he identified.  Tr. 51.  Davenport's attorney asked if the VE's

answer would change if the hypothetical individual needed five additional breaks for 5-10 minutes at a time or would be absent about five days a month. Tr. 51. The VE stated that there would be no work for one so limited. Tr. 51. Davenport's attorney asked the VE if the individual's ability to perform the jobs he identified would change if the individual was limited to four hours of sitting, walking for 30 minutes for a total of two hours, and standing for 30 minutes for a total of 3 hours. Tr. 51-52. The VE answered that, because that only adds up to being at the workstation for seven hours standing and sitting, and the individual would need a cane when walking, she could not perform the work he identified or other work. Tr. 52.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.   If claimant is doing substantial gainful activity, he is not disabled.

2.   If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[5] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In her June 14, 2016, decision, the ALJ made the following findings:

1.   The claimant has not engaged in substantial gainful activity since June 11, 2014, the application date.  Tr. 14.

2.   The claimant has the following severe impairments: degenerative joint disease right knee; torn medial meniscus left knee; degenerative disc disease lumbar spine; and depressive disorder.  Tr. 14.

3.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 15.

---

[5] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq.*  The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*, corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

4. The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.967(a) except: lift, carry 10 pounds occasionally, stand or walk two hours, sit six hours, use of cane when standing and walking; occasionally climb stairs, ramps, bend, balance, stoop; no kneeling or crawling; reach all directions; frequent handling, fingering and feeling, no exposure to extreme temperatures, humidity, vibration or hazards; simple routine tasks with simple, short instructions, make simple decisions, have few changes[, and] superficial interacti[on] with coworkers, supervisors and the public.  Tr. 17.

5. The claimant is unable to perform any past relevant work.  Tr. 26.

6. The claimant was born on October 18, 1967 and was 46 years old, which is defined as a younger individual age 45-49, on the date the application was filed.  Tr. 26.

7. The claimant has at least a high school education and is able to communicate in English.  Tr. 26.

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills.  Tr. 26.

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 26.

10. The claimant has not been under a disability, as defined in the Social Security Act, since June 11, 2014, the date the application was filed.  Tr. 27.

### V. Parties' Arguments

Davenport objects to the ALJ's decision on two grounds.  Doc. 16, p. 1.  She argues that the ALJ did not adequately evaluate her severe mental impairment or her complaints of disabling pain.  Id.  In response, the Commissioner submits that the ALJ reasonably evaluated the record and her decision is supported by substantial evidence.  Doc. 19, pp. 7-14.

### VI. Legal Standard

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In *Drummond v. Comm'r of Soc. Sec.*, the Sixth Circuit stated, "absent evidence of improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ." 126 F.3d 837, 842 (6th Cir. 1997). The Social Security Administration acquiesced in this ruling. *See* Acquiescence Ruling 98-4(6), 1998 WL 283902 (June 1, 1998) ("AR 98-4"). In AR 98-4, the Administration explained,

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

*Id*. at *3.

Here, the ALJ stated that she considered the findings made by the prior ALJ and that, absent new and additional material evidence or changed circumstances, she was bound by the findings of the prior ALJ. Tr. 12. The ALJ then detailed the evidence submitted by Davenport that was dated after the prior ALJ's decision (April 12, 2013). Tr. 18-26. After discussing this evidence, the ALJ concluded that this evidence did not show a change in Davenport's condition per *Drummond*, and, as a result, the ALJ adopted the prior ALJ's RFC. Tr. 26.

## VII. Analysis

### A. The ALJ correctly construed the record with respect to Davenport's mental impairments

Davenport argues that the ALJ misstated the record when explaining her reasons for assigning "little weight" to the opinion of Dr. House, the consultative examiner.  Doc. 16, p. 13. First, she argues that the ALJ stated that Dr. House based his opinion on a one-time examination, but points out that Dr. House also saw and evaluated Davenport in 2011 in connection with her prior application.  Id.  But the ALJ did note that Dr. House evaluated Davenport in 2011 in connection with her prior application.  Tr. 22 ("[Dr. House's] report notes that the doctor referenced his own prior evaluation..."; "[Dr. House] felt that the claimant's level of concentration had declined from the prior examination in 2011...").  The ALJ's statement—that Dr. House's <u>2014</u> opinion was based on a one-time appearance—was accurate, as Dr. House based his 2014 opinion on Davenport's one-time, 2014 appearance.

Next, Davenport argues that the ALJ discredited Dr. House's opinion on the following, faulty premise: that Dr. House had opined that "treatment would not be helpful" to Davenport, when Dr. House actually opined that Davenport's prognosis is poor "because she would not commit to treatment."  Doc. 16, p. 17.  However, in her explanation, the ALJ remarked that recent records from Dr. Klein post-date Dr. House's opinion; those records show that Davenport improved when she took her medication; and that this newer evidence is inconsistent with Dr. House's opinion that Davenport's "mental health condition is not treatable."  Tr. 22.  Although the ALJ's wording is not exact, her reason and premise for discounting Dr. House's opinion is accurate: Dr. House opined that Davenport's prognosis was poor because she would not commit to being treated, but records show that Davenport thereafter did commit to treatment and that, once she did, her symptoms improved.

Davenport contends that Dr. House's opinion was consistent with Dr. Klein's opinion, and that the ALJ also inaccurately assessed Dr. Klein's opinion. Doc. 16, pp. 13-14. She argues that the ALJ "suggest[ed]" that Dr. Klein's opinion was based solely on Davenport's subjective complaints but that this suggestion is incorrect. Doc. 16, p. 14. The undersigned disagrees. The ALJ accurately stated that Dr. Klein's opinions were based on Davenport's self-reporting, per Dr. Klein's own statement in his opinion. Tr. 23 (citing Dr. Klein's opinion (Tr. 977), wherein Dr. Klein answered the question "state approximately when the limitations...initially manifested" with "[patient] states around age 13-14" and, when asked to provide additional comments that would support his assessed limitations, wrote, "no one other than Ms. Davenport's own descriptions which sound credible."). The ALJ also stated that Dr. Klein's records show that Davenport had reported that her medications did not work and that Dr. Klein reminded her that she had not been seen in several months and that she had not been taking her medication. Tr. 23. Davenport submits that this statement is incorrect because the treatment note that the ALJ cites does not support her assertion that Dr. Klein stated that Davenport was not taking her medication on February 26, 2016. Doc. 16, p. 14. But the records from Davenport's visits to see Henderson and Dr. Klein at Connections show that she did not see Dr. Klein for four months and that, during part of that time, she had not been taking her medications. Tr. 974-1011. Elsewhere in her decision, the ALJ detailed this chronological evidence. Tr. 21-22 (ALJ stating that Davenport started treating at Connections; was prescribed medication by Dr. Klein in September 2015; her issues improved on that medication and she continued to work with her case manager Henderson; for more than a month (January-February 2016) she was not taking medication and her issues got worse; she restarted her medication and reported improvement). Thus, it is

accurate to say that Dr. Klein's treatment note stated that Davenport had not been taking her medication in response to Davenport's complaint that her medication did not work.

In sum, the ALJ correctly construed the record when explaining her decision regarding Davenport's mental health issues.

**B. The ALJ properly evaluated Davenport's complaints of pain**

Davenport argues that the ALJ improperly evaluated her complaints of pain. Doc. 16, p. 15. She asserts, "there is no evidence" that the ALJ "actually evaluated Ms. Davenport's pain in accordance with the requirements of the regulations." Id. Instead, she contends, the ALJ "simply conducted a recitation of the medial evidence" and did not explain how she arrived at her conclusion that Davenport's complaints of pain "are not entirely consistent with the medical evidence and other evidence in the record." Doc. 16, p. 16.

Pursuant to 20 C.F.R. § 416.929(c), when assessing a claimant's complaints of pain, an ALJ considers the claimant's statements, objective medical evidence, opinion evidence, and other evidence, such as daily activities, location, duration, frequency and intensity of pain, and treatment and medication. *See also* SSR-7P, 1996 WL 374186.

Here, the ALJ discussed Davenport's statements about her pain. Tr. 18 (describing Davenport's testimony that she could not stand for more than one hour, experienced excruciating pain 65% of the day without pain medications, pain medications only gave her about 30 minutes of relief, and that she used marijuana weekly to relieve pain). The ALJ discussed the objective medical evidence, including generally normal physical exam findings and that Davenport walked with a slow and/or antalgic gait. Tr. 18-20. She discussed Davenport's treatment, including her inconsistent use of a cane (Tr. 19, 23), her reports of experiencing benefits from knee surgery and injections (Tr. 20), her conservative medication use (Tr. 19 (daily pains unrelieved by

occasional over-the-counter Aleve)), and Dr. Patterson's remark that, while she may need right knee surgery in the future, "This would be deferred until such point in the future that her symptoms are no longer managed by modification of activity and medication," i.e., Davenport's symptoms were currently being managed by modification of activity and medication. Tr. 19-20. The ALJ analyzed the opinion evidence, which Davenport does not challenge. Tr. 22, 23-24. In short, the ALJ considered and discussed the evidence required by 20 C.F.R. § 416.929(c); she "actually evaluated Ms. Davenport's pain in accordance with the requirements of the regulations" and explained how she arrived at her conclusion. Doc. 16, p. 15.

## VIII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED.**


IT IS SO ORDERED.



Dated: September 18, 2017

_____
Kathleen B. Burke
United States Magistrate Judge